Filed 7/30/26  In re A.D. CA2/4
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re A.D., <br><br> a Person Coming Under the Juvenile Court Law. | B336356 <br><br> (Los Angeles County <br>   Super. Ct. Nos. 23CCJP04283, <br>   23CCJP04283A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>     Plaintiff and Respondent, <br><br>     v. <br><br> Y.D. et al., <br><br>     Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mary E. Kelly, Judge.  Affirmed.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Appellant Mother.

Paul Couenhoven, under appointment by the Court of Appeal, for Appellant Father.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Respondent Minor.

_____

**INTRODUCTION**

Mother Y.D. challenges the juvenile court's order exercising jurisdiction over her six-year-old son, A., under Welfare and Institutions Code section 300, subdivision (b).[1] Mother and A.'s father, I.D., both challenge the juvenile court's disposition ruling removing A. from mother's care and placing A. with father, and continuing jurisdiction over A. We find no error, and therefore affirm.[2]

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Detention*

A. was born in July 2017. According to an assessment in 2023, he was "non-verbal in diapers, can't feed himself, … and he has ga[it] problems." The Regional Center diagnosed A. with "intellectual disability," and at school he

---

[1]    All undesignated section references are to the Welfare and Institutions Code.

[2]    This court issued an opinion in this matter on August 29, 2025 affirming the juvenile court's orders. Mother sought review in the California Supreme Court, which granted review and stayed the matter. The Supreme Court decided *In re S.R.* (2025) 18 Cal.5th 1042 (*S.R.*) and transferred the matter back to this court with directions to vacate the prior decision and reconsider the cause in light of *S.R.* Mother filed a supplemental brief following transfer, which we have considered.

2

qualified for the "severely handicapped" program.  A. was attending a school on an out-of-district permit, but the school was not able to meet A.'s needs and he was disenrolled.

In October 2023, the Los Angeles County Department of Children and Family Services (DCFS) received a referral stating that A. might be a victim of physical abuse by mother.[3]

A children's social worker (CSW) met with mother on October 30, 2023. Mother was upset about the referral and asked who was "making things up" about her.

Mother admitted that she said she sometimes wanted to "kill" A. but said she never meant it.  She said she was going through a lot, and "I am a human being, I have the right to feel overwhelmed, anxious and depressed but that doesn't mean I cannot take care of my son."  The CSW "explained to mother that the statements she made about 'wanting to kill her son' are not being taken lightly [and] with a combination of statements of feeling depressed and overwhelmed raised concerns for the Department for her ability to parent child [A.] an Autistic non-verbal child."  The CSW asked mother to take a psychological examination, but mother refused because she said she was planning to be a surrogate mother and she was concerned that a psychological evaluation could interfere with that plan.

A. had been referred to the Regional Center in 2019 for developmental delays, but he was not currently receiving any services, and mother could not recall when A. last received services.  When the CSW expressed the importance of A. receiving services, mother said, "You are asking me to do so

---

[3]    There had been previous referrals of abuse and neglect in February 2019, September 2021, January 2022, and June 2023; each was deemed "inconclusive."

much and right now I feel overwhelmed so you're going to have to give me time." Mother also told the CSW she was being evicted and had to move out of her apartment in less than two weeks. The CSW gave mother information about housing support.

The CSW noted that A. was "comfortable and happy" with mother, and he had no marks or bruises. A. was minimally verbal, and would point and make sounds to get mother's attention. Mother refused to sign forms to allow DCFS to access A.'s medical records.

An academic counselor at the community college mother attended reported that she had been mother's counselor for about two years. Mother had recently dropped all of her classes. The counselor said mother showed signs of depression and had been suicidal, but she did not have a plan to carry it out. Mother had told the counselor that sometimes "I feel like killing" A., but mother "quickly retracted her statement with, 'I mean, I would never do that. It is just overwhelming.'" The counselor's colleague reported that mother said she wanted to put A. up for adoption.

The CSW texted mother on two weeks later to ask how she was doing, check about finding housing, and to ask about a psychological evaluation. Mother responded, "I'm overwhelmed. And I just feel like I don't want to do anything with my life anymore. I would like the help for the evaluation."

When the CSW met with mother at the DCFS office on November 21, 2023, mother said she was homeless and started to cry. Mother said A. was still not enrolled in school and was not receiving any services. Mother said she did not like schools in Los Angeles Unified School District and wanted to continue trying to get A. enrolled in an out-of-district school. Mother said she was angry at father and thought he was having a romantic relationship with

4

A.'s former behavioral therapist. Mother also said, "I don't want to kill myself, it's just thoughts but I don't have a plan."

The CSW told mother that four things were needed for DCFS to close the investigation: a psychological evaluation to address mother's statements about her depression and harming A., confirmation that A. was up to date on his medical care, reinstatement of services for A., and for A. to be enrolled in school. Mother said, "It's too much. I am overwhelmed and you people need to give me time." Mother declined to sign the form for a psychological evaluation. Mother initially agreed to take a drug and alcohol test, but after the CSW texted mother the relevant information, mother replied that she should not have to do "all these things" just because someone lied about her.

The CSW spoke with father by phone. Father said he had no concerns about mother's mental health or A.'s safety in mother's care. A.'s daycare provider said she had no concerns about mother abusing or neglecting A. The daycare provider said mother was "very involved" and asked appropriate questions when she picked up A. She also said that only mother drops off and picks up A.; she had never met father.

On November 29, 2023 the Regional Center service coordinator told the CSW that A. had not had services since July 2023. Mother had canceled and rescheduled multiple appointments. When the coordinator tried to schedule a meeting with mother, mother said "I cannot think right now." Mother had also accused the Regional Center of reporting her to DCFS.

The CSW spoke with Ms. S., the principal of A.'s former school. Ms. S. said there were "a lot of concerns" about A., and that mother was "very unstable" and "a very difficult person to work with." A. had been enrolled in the school "as a speech only kid," but testing revealed that he "qualified for the severely handicapped program because he has a lot of needs." School

5

staff tried "to get the mother to meet with them to discuss their concerns" about A. needing additional services, but "mother was not receptive to their observations and refused to engage with them.... When the school staff was finally able to talk to the mother about the minor being evaluated and scheduling an IEP, the mother refused to sign the IEP which included services such as speech and occupational therapy. Ms. S[.] indicated that when the mother finally agreed to sign the IEP it was nearly two months after the meeting," at which point the school "was impacted and would not be able to service the minor." Ms. S. said that mother was provided with relevant paperwork, and "[a]ll [mother] had to do was take the paperwork to her home district and by law that district was obligated to meet her child's educational needs." Mother then "blew up all our emails," sending "very erratic, very irrational" emails "at all hours of the night." Mother complained to the district and was kicked out of the district office.

Ms. S. said that mother also engaged in "constant yelling and abusing [the] school staff in front of [A.], belittling [the] campus staff and belittling [the] office managers." Ms. S. described an incident between mother and another parent. The incident started with a verbal altercation, then, with A. in the car, mother backed into the other parent's car before driving away. Two weeks later, mother yelled at the same parent again, threatening to follow the parent home and saying, "[Y]ou are going to see what happens because you disrespected me." Ms. S. "informed mother ... that her permit for her child to attend school was in jeopardy. At that point, finally [mother] calmed down." Mother was then banned from the school campus for two weeks, but she violated the ban by going to the school before the two-week period ended.

On December 1, 2023, mother enrolled A. at a different school. The CSW spoke with an office secretary at the school on December 6. The secretary said mother brought A. to school in a wet diaper and dirty clothing; A. looked like he had just woken up. The secretary said the district was working with mother to provide clothing, housing, and diapers.

On December 8, 2023, the juvenile court ordered that A. be detained from mother's care. On December 11, A. was placed with father who had just moved to New York with his girlfriend. Mother then sent a series of text messages to the CSW that included statements such as, "You will pay later in the future. I will get my son back. I never ever did anything to my child and never abuse[d] him. There is no pro[of] and definitely there's war between you and me you bitch!!" Mother also called the CSW a "miserable bitch" and said, "Hope you go to hell!! And you will."

When a different CSW spoke with mother on December 12, mother ranted about how the first CSW was "corrupt" and a "dirt bag." Mother said the first CSW had "brainwashed" father, and that karma would get her. When the second CSW asked if mother wanted to leave a message for the first CSW, mother said to tell her, "Fuck you, fuck yourself. [The first CSW's name] will be on her tombstone. Someone will murder her," and mother laughed. When the second CSW asked if mother was threatening the first CSW, mother said, "Not me, someone will murder her. Fuck her." Mother also threatened that she would "do everything to take [the first CSW's] child."

On December 13, 2023, DCFS filed a juvenile dependency petition under section 300, subdivision (b)(1). Allegation b-1 asserted that A. had been diagnosed with intellectual disabilities but mother had medically neglected him by failing to follow up with the Regional Center since July 2023. Allegation b-2 asserted that mother had a history of mental and

7

emotional problems, including depression, suicidal ideation, homicidal ideation, anxiety, "paranoid and erratic behavior, and volatile and unstable behavior," which interfered with her ability to care for A. Allegation b-3 asserted that mother created a dangerous situation for A. by engaging in a verbal altercation with another parent at A.'s school, hitting the other parent's car with her own while A. was in the car, and engaging in verbal altercations with school staff.

At hearings on December 28 and 29, 2023, the juvenile court found a prima facie basis for detention.

B.      *Jurisdiction*

According to the jurisdiction/disposition report filed on January 24, 2024, A. was living with father in New York. When the DCFS investigator asked father about closing the case with an order granting father full custody, father said it was not his goal to get full or partial custody of A., and he thought A. should be with mother. Father "did not know where to take the minor for medical attention [or dental care] and stated, 'he looks fine to me.'" A. was not enrolled in any therapy, services, or school in New York. When asked about the petition allegations, father said he was not aware that mother had not obtained services for A.

At an interview on January 19, 2024, mother denied the allegation that A. stopped receiving services. She said that A. was getting speech and occupational therapy at his school. However, mother later said that the school "never gave my son the services that he needed." Mother denied she had mental health issues such as depression, anxiety, paranoia, or erratic behavior. She denied ever saying she wanted to kill herself or A. Mother also said she did not get a psychological evaluation because the CSW told her it was voluntary, and mother was already seeing a therapist at her college.

8

The Regional Center coordinator said that school-age children typically get services in school, but the Regional Center offers "supportive services such as Case Management, assistance applying for SSI, school enrollments, and ABA Services" if not otherwise provided. The coordinator said that mother refused services, was uncooperative, and accused the coordinator of reporting mother to DCFS.

An addendum report filed February 7, 2024, stated that father, "after having time to reconsider" his position regarding A., decided it was in A.'s best interest for father to have custody. Father made an intake appointment for A. at his local Regional Center in New York; the appointment was set for June. Father had also taken A. to medical and dental appointments, and A. was enrolled in school, where he would receive speech and occupational therapy. During a visit, the CSW observed that A. appeared to be happy and comfortable living with father, his partner, and the partner's family members.

Mother was having monitored video visits with A.; she was on time, consistent, engaged, and affectionate with A. Mother had enrolled in anger management and parenting courses, and had completed one class in each course. Mother also submitted a letter from a therapist at the community college stating that mother was meeting with him "regularly."

At the jurisdiction hearing on February 8, 2024, counsel for mother asked the court to dismiss the petition for insufficient evidence. Counsel for A. asked that the petition be sustained, and counsel for DCFS joined A.'s argument. Father's counsel did not take a position. The juvenile court amended the petition to remove the allegation about mother saying she wanted to kill A. because mother had "immediately retracted the statement," and sustained the petition as amended.

9

The court ordered mother to participate in parenting classes and individual counseling, and ordered mother to complete a psychological evaluation.

C.    *Disposition*

A last-minute information filed March 25, 2024 stated that father, his girlfriend, and A. moved back to California and were living in Orange County. A. had been enrolled in school and was receiving special education services in school. Connection with the appropriate Regional Center office was pending.

The last-minute information stated that mother sent DCFS a copy of an evaluation for psychotropic medications; it is a photograph of a two-page handwritten paper and is largely illegible. Mother had attended a therapy intake appointment in January and had attended a single therapy session in February. When the CSW told mother that her therapy sessions should be weekly instead of monthly, mother "was skeptical." Mother had attended one parenting class.

Mother had in-person monitored visitation with A. after his return to California; she was affectionate and caring with A. However, toward the CSW mother was "reactive and [took] offense easily." When A. cried about leaving mother, mother "lacked the ability to understand" A.'s reaction, and instead began asking A. if the CSW hit him or touched him inappropriately.

At the disposition hearing on March 28, 2024, mother's counsel asked that A. be returned to mother's care and the case be closed, or in the alternative that the case remain open with mother's visitation advancing to unmonitored visits. Father's counsel asked that the case be closed with an order granting custody to father, who was nonoffending. A.'s counsel argued against unmonitored visitation for mother due to her "volatile" behavior in

10

A.'s presence and lack of progress in her case plan. A.'s counsel also asked that the case remain open because A. had special needs that were not being met because A. was not yet receiving Regional Center services. The court suggested that it might be "premature" to close the case because father just moved back to California and he was still trying to get A. enrolled in services. DCFS's counsel also requested that the case be closed with an order for custody to father.

The court found clear and convincing evidence to support A.'s removal from mother. The court expressed concern about closing the case before A. was connected with appropriate Regional Center services, and therefore found that conditions warranted continued jurisdiction. The court set a hearing for September 25, 2024.[4]

Mother and father each timely appealed.

## DISCUSSION

Mother challenges the court's jurisdiction ruling and disposition order removing A. from her care. Father challenges the court's disposition order to keep the case open rather than close the case with an exit order granting custody to him. DCFS asserts that the jurisdiction ruling should be affirmed, and the disposition order removing A. from mother's care should be affirmed; DCFS takes no position on father's challenge to the disposition ruling. A. asserts that the jurisdiction and disposition rulings should be affirmed in full.

---

[4] A. filed a request for judicial notice in this court attaching minute orders from the juvenile court dated May 2, 2024, September 25, 2024, and January 6, 2025, citing Evidence Code sections 452, subdivision (d) and 459. A. did not explain why he was seeking judicial notice or how these documents might be relevant to this appeal. A.s' request is therefore denied. (See, e.g., *In re R.M.* (2024) 99 Cal.App.5th 240, 246, fn. 4 ["'a litigant must demonstrate that the matter as to which judicial notice is sought is both relevant to and helpful toward resolving the matters before this court"].)

11

"'In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.'" (*In re R.T.* (2017) 3 Cal.5th 622, 633.)

A.    *Jurisdiction*

Jurisdiction under section 300, subdivision (b)(1) is appropriate when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] ... [¶] (C) The willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

Mother contends the jurisdiction order is not supported by substantial evidence. She challenges each of the three jurisdictional findings: allegation b-1, alleging that mother "medically neglected" A. by failing to obtain Regional Center services; allegation b-2, alleging that mother's mental and emotional problems placed A. at risk of harm; and allegation b-3, relating to the hit-and-run incident at A.'s school. We address mother's contentions on allegations b-1 and b-2.[5]

---

[5]    Because we find jurisdiction was appropriate under allegations b-1 and b-2, mother's contentions regarding allegation b-3 are moot. (See, e.g., *In re D.P.* (2023) 14 Cal.5th 266, 283 ["the principle that '[d]ependency jurisdiction attaches to a child, not to his or her parent' [citation], means that "'[a]s long

12

1.  *Allegation b-1*

Allegation b-1 asserted that A. had an "intellectual disability" and was "severely handicapped," and that mother "medically neglected the child by failing to follow up with Regional Center services since 07/20/2023, for recommended speech and occupational therapy," which placed A. at risk of serious physical harm. Mother contends this allegation was not supported by substantial evidence.

First we address mother's mootness argument. This court's August 29, 2025 opinion affirmed the juvenile court's jurisdiction finding as to allegation b-2, and found the remaining two allegations moot. (See *ante*, fns. 2 & 4.) Following transfer from the Supreme Court, mother argues that under the reasoning of *S.R., supra*, 18 Cal.5th 1042, her arguments as to allegation b-1 are not moot.

*S.R.* stated that "a parent's appeal from a juvenile court's jurisdictional finding survives a mootness challenge where the parent shows that an agency must report the allegation underlying the court's finding for inclusion in the CACI." (*S.R., supra*, 18 Cal.5th at p. 1048.) Substantiated findings must be included in CACI when they amount to "severe neglect"; findings of "general neglect" are not included. (See Pen. Code, § 11169, subd. (a); *In re Emily L.* (2021) 73 Cal.App.5th 1, 14.)

Mother argues that medical neglect, as alleged in allegation b-1, can qualify as either severe neglect or general neglect depending on whether it

as there is one unassailable jurisdictional finding, it is immaterial that another might be inappropriate"""].) Mother has provided no basis to overcome a mootness challenge (see *S.R., supra*, 18 Cal.5th at p. 1048 [the burden is on the parent to overcome mootness]), and we decline to exercise our discretion to consider the issue despite its mootness. (See *In re D.P., supra,* 14 Cal.5th at pp. 283–284.)

was intentional. Indeed, Penal Code section 11165.2, subdivision (a) defines "severe neglect" to include "the intentional failure to provide adequate ... medical care" to a child, and subdivision (b) defines general neglect to include "negligent failure ... to provide adequate ... medical care" to a child. Mother asserts that the sustained findings in allegation b-1 could be interpreted to be intentional and therefore could be included in the CACI, so her arguments as to this allegation are not moot. We agree, and find that mother's contentions as to allegation b-1 are not moot.[6]

Turning to the merits of mother's argument, she contends allegation b-1 was "plainly contradicted by the record" because "[a]s the Regional Center services coordinator clearly explained, school-aged children obtain speech and occupational therapy from school and not the Regional Center." Mother is correct that a Regional Center coordinator said this. However, substantial evidence demonstrates that A. was a special needs child who had a history of not receiving the services he needed.

A. was referred to the Regional Center in 2019, but the record does not reflect any consistency in services. An assessment in early 2023 showed that A. was minimally verbal, he needed help eating and drinking, and he could not use the toilet by himself. A.'s school was not able to meet A.'s needs, and A. was disenrolled. Mother then did not enroll A. in a new school for months, nor did mother take A. to receive services at the Regional Center.

Mother blames the lapse in services on A.'s school for disenrolling him, stating that the lack of services was "due to the actions of [the school and] not Mother." This argument is not persuasive. First, dependency jurisdiction under section 300, subdivision (b) does not require a finding that "a parent is

_____

[6] Mother's motion to consider additional evidence, filed May 22, 2026, is denied.

14

at fault or blameworthy for her failure or inability to supervise or protect her child." (*In re R.T., supra*, 3 Cal.5th at p. 624.) Thus, it does not matter whether mother *caused* the disruption in A.'s services; the only relevant question was whether A. was at risk of harm while in mother's care.

Second, mother did play a significant role in the disruption in services. Evidence showed that A.'s disenrollment from his first school was caused by mother's lack of cooperation and delays in signing documents. After A. was disenrolled, mother did not enroll him in a new school because she did not like the local options available. The Regional Center coordinator also reported that she had "offered supportive services however, the mother refused the services many times," "mother kept canceling her appointments," and "every time she made contact with the mother, the mother had an attitude and was uncooperative." Thus, mother's contention that she had nothing to do with A. not receiving needed services is not supported by the record.[7]

Mother also argues that substantial evidence does not prove that A.'s lack of services placed him at serious risk of *physical* harm at the time of the jurisdiction hearing. She argues that A.'s move to New York caused even more delays in his receipt of services, and "[w]hile it is appalling that the

---

[7]     Mother also argues that A. was "presumably" receiving services at he school where he had recently been enrolled. She does not point to any evidence in the record to support this presumption. As we must under a substantial evidence standard of review, we "review the record in the light most favorable to the [juvenile] court's determinations" (*In re R.T., supra*, 3 Cal.5th at p. 633), and do not presume a silent record supports the appellant's position.

15

Department's unnecessary intervention caused this additional disruption, there is no evidence that [A.] was seriously physically harmed as a result."[8]

Whether A. suffered actual harm is not relevant; a court "need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.) A. was severely handicapped and had trouble with basic functions such as speaking, feeding himself, and toileting. A. was therefore more vulnerable than a typical school-aged child, with a limited ability to meet his own physical needs or ask for help. "[A] child's youth and maturity level can bear upon the care that the child may require and whether a parent's [conduct] places the child at substantial risk of serious physical harm." (*In re N.R.* (2023) 15 Cal.5th 520, 559.) A. was connected with the Regional Center for services in 2019, yet mother had a history of failing to follow up, attend appointments, or provide any consistency in A.'s services. Mother was also combative with those attempting to provide support for A., thus neglecting A.'s special needs and undermining his potential to improve basic life skills. (See, e.g., *In re John M.* (2012) 212 Cal.App.4th 1117, 1126 [due to a child's significant needs, the "mother's failure to ensure that he attended his specialized school, and her failure, and even resistance, to procuring

---

[8] Appellate counsel's representation of DCFS's actions as "appalling" and "unnecessary" is representative of commentary peppered throughout mother's briefing, which expresses scorn for father, DCFS, A.'s schools, and more. We remind counsel that "[a]d hominem attacks and other invective detract from counsel's legal arguments, signal inappropriate personal embroilment in the dispute, and indicate an inability to engage in the reasoned analysis the courts need and counsel's clients deserve. When counsel resort to name-calling and to unsupported claims of misconduct, they risk obscuring any meritorious arguments they may have. Appellant's counsel would be well advised to refrain from incivility in the future." (*WasteXperts, Inc. v. Arakelian Enterprises, Inc.* (2024) 103 Cal.App.5th 652, 667.)

16

appropriate services for [the child], placed him at substantial risk of serious harm"].)  Substantial evidence therefore supports the juvenile court's jurisdiction finding as to allegation b-1.

2.  *Allegation b-2*

As sustained, allegation b-2 asserted that mother "has a history of mental and emotional problems, including depression, suicidal and homicidal ideation, anxiety, paranoid and erratic behavior, and volatile and unstable behavior, which renders the mother unable to provide regular care of the child....  The mother failed to participate in consistent mental health services for the mother's mental and emotional problems.  Such mental and emotional problems on the part of the mother tend [to] endanger the child's physical health and safety from time to time, and places [*sic*] the child at risk of serious physical harm, damage and danger."

Mother argues that "proof of a mental health issue alone" is insufficient to support a jurisdictional finding under section 300, subdivision (b).  Mother acknowledges that people found her "difficult and demanding," but asserts that substantial evidence did not demonstrate that A.'s physical health and safety were at risk as a result.

We disagree; the record contains substantial evidence that mother's depression, hostility, volatility, aggression, and sense of being overwhelmed placed A. at risk of harm.  The staff at A.'s school recognized that A.'s needs were not being met, but mother refused to engage with school staff and missed A.'s Regional Center appointments.  By the time an IEP was completed and mother finally agreed to sign it, the school was "impacted" and

17

was no longer able to meet A.'s needs. Mother also engaged in a hit-and-run accident, while A. was in the car, during an altercation with another parent.[9]

By the end of October 2023, A. was not enrolled in any school or services. When the CSW told mother that A. was overdue for a medical check-up and he needed to be enrolled in school and special services, mother told the CSW that she was too overwhelmed to attend to A.'s needs. Mother also told the CSW that she had not been happy since 2014, and she had thoughts of suicide. The evidence therefore showed that mother's depression, sense of being overwhelmed, and ongoing hostility toward school staff, the Regional Center coordinator, and social workers substantially interfered with A.'s ability to receive the services he needed.

Mother argues that "by the time of the jurisdictional hearing Mother had shown that she had been regularly attending individual therapy ... for nearly 3 months." The record does not support this claim. DCFS first requested that mother get a psychological evaluation in October 2023, and by the time of the jurisdiction hearing on February 8, 2024, mother still had not completed one. Mother points to the letter from a therapist at her college, dated in January 2024, stating that mother had been seen "regularly" for individual therapy since October 2023. However, the record also shows that mother dropped out of college in October 2023. Mother completed an intake appointment and began working with a different therapist in January 2024, suggesting that she either was not consistently seeing the college therapist or that the college therapist was not meeting her needs.

Mother also argues that the court should have stricken the phrase "homicidal ideation" from allegation b-2. She notes that the court struck the

---

[9] Mother does not deny this occurred. She argues that "a single fender bender where the child was unharmed is not jurisdictional."

allegation that mother wanted to kill A. Mother asserts that the "only piece of evidence that could possibly be connected to the notion that Mother ever thought about killing another human being" was mother's comment that sometimes she wanted to kill A., which she quickly retracted.

There are other instances in the record of mother threatening to harm or kill people. Mother threatened to follow a parent home from school and "see what happens" as a result of the parent "disrespect[ing]" mother. Mother also threatened the CSW, saying that she was going to "war" against the CSW. Mother asked a second CSW to convey a message to the first CSW that her name "will be on her tombstone. Someone will murder her," then mother laughed. Thus, mother has not demonstrated that the inclusion of "homicidal ideation" in allegation b-2 is unsupported by substantial evidence.

Substantial evidence supports a finding that mother's mental health needs were not being sufficiently addressed at the time of the jurisdiction hearing, and that A.'s safety was at risk as a result. Mother therefore has not demonstrated error with respect to allegation b-2.

B.    *Disposition*

Both mother and father challenge the disposition order. Mother argues that substantial evidence does not support the court's decision to remove A. from her care. Mother also asserts that the court's reliance on an unsubstantiated allegation violated mother's due process rights. Father contends the court erred by continuing jurisdiction rather than closing the case with an exit order granting full custody to him. We find no error.

1. *Mother's Contentions*

We first address mother's contention that A. should not have been removed from her care. "A dependent child shall not be taken from the physical custody of [a parent] with whom the child resides at the time the

19

petition was initiated, unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's ... physical custody." (§ 361, subd. (c)(1).) As noted above, we review a disposition order for substantial evidence, reviewing the record in the light most favorable to the order and drawing all reasonable inferences from the evidence to support the findings of the dependency court. (*In re R.T.*, *supra*, 3 Cal.5th at p. 633.) When doing so, however, we take into account the level of confidence required by the "clear and convincing evidence" standard in section 361, subdivision (c). (*In re Zoe H.* (2024) 104 Cal.App.5th 58, 71.)

Substantial evidence supports the court's ruling. As discussed above, there was substantial evidence that mother's mental health issues placed A. at risk of harm. A. has significant special needs and requires an increased level of attention and care. Mother was depressed, too overwhelmed to timely arrange for the services A. needed, combative with the other adults in A.'s life who were trying to offer support and services, and committed a hit-and-run accident while A. was in the car as part of an altercation with another parent.

Notably, DCFS tried to work with mother without removing A. from her care from the time of the referral in late October 2023 until early December 2023. However, mother was uncooperative and openly hostile to the CSW. After A. was removed from mother's care in December 2023, mother threatened the CSW. In early 2024, mother continued to be "reactive" and easily took offense with respect to the CSWs who monitored her visitation with A. This suggests that mother had not made significant

20

progress with the issues that led to jurisdiction, because she still had anger issues and was still being uncooperative and hostile to the other adults in A.'s life. The evidence supported the court's finding by clear and convincing evidence of a threat to A.'s well-being if he were returned to mother's care, and that there were no reasonable means by which A.'s health could be protected without removing him from mother's physical custody.

Mother contends the court erred by referencing a referral by an anonymous caller during the disposition hearing. Mother asserts she was deprived of due process because DCFS had deemed the referral inconclusive, and mother "had no opportunity or ability to subpoena the hearsay declarant the court relied upon."

"'In juvenile dependency litigation, due process focuses on the right to notice and the right to be heard.'" (*J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 536–537.) Mother relies on *In re Malinda S.* (1990) 51 Cal.3d 368, which addressed the admissibility of hearsay relating to a *jurisdiction* finding, and has been superseded by changes to section 355. Mother's argument ignores settled law regarding admissibility relating to *disposition.*

"[I]t is settled that hearsay evidence, which would be inadmissible at a jurisdiction hearing, may nevertheless be considered at a dispositional hearing." (*In re Vincent G.* (2008) 162 Cal.App.4th 238, 243.) "'At the ... dispositional phase, any relevant evidence including hearsay shall be admitted pursuant to section 358, subdivision (b) to help the court determine the child's best interests.'" (*In re Madison T.* (2013) 213 Cal.App.4th 1506, 1509, citing *In re Corey A.* (1991) 227 Cal.App.3d 339, 347; see also *In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816.) Thus, mother did not have a right of cross-examination at the disposition hearing. Moreover, even

without the referral the juvenile court mentioned at the hearing, there was ample evidence to support the court's finding.  Mother therefore has not met her burden to demonstrate error in the court's disposition order removing A. from her care.

2. *Father's Contentions*

Father contends the juvenile court erred at the disposition hearing by keeping the case open rather than closing the case with an order granting custody to father.

When a court orders removal of a dependent child from the custodial parent, it must determine whether there is a noncustodial parent "who desires to assume custody of the child."  (§ 361.2, subd. (a).)  If the court places the child with that parent, the court may choose one of three options: it may grant custody to the second parent and terminate jurisdiction (§ 361.2, subd. (b)(1)), it may "[o]rder that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months" (*id*., subd. (b)(2)), or it may "[o]rder that the parent assume custody subject to the supervision of the juvenile court," and order services for one or both parents (*id*., subd. (b)(3)).  Here, the juvenile court chose the third option.

"Juvenile courts have 'wide latitude' in formulating reasonable dispositional orders for the care, custody, support, and well-being of dependents subject to their jurisdiction."  (*In re A.F.* (2024) 102 Cal.App.5th 778, 785.)  We review disposition orders denying a request for dismissal for abuse of discretion; such an abuse occurs when the court's determination is arbitrary, capricious or patently absurd.  (*Id.* at p. 786; *In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1288.)

22

The court did not abuse its discretion by maintaining jurisdiction over A. at the March 28, 2024 hearing. When the case was initiated in October 2023, father was not involved in A.'s life. A. was placed with father on December 11. When the CSW spoke with father on January 19—nearly six weeks after A. was placed with him—father said he was not interested in having permanent custody of A., A. had not been enrolled in school, and father said he did not know how to find medical or dental services for A. Father eventually got A. enrolled in school and some school-based services in New York. But father moved back to California less than a month before the disposition hearing, resulting in another disruption in services for A. A major focus of this case was that A. was not receiving the services required to address his special needs, and at the time of the disposition hearing A. had not received Regional Center services for eight months. Under these circumstances, the court did not abuse its discretion in maintaining jurisdiction to ensure that A.'s needs would be met.

Moreover, it appeared that A.'s relationship with mother could benefit from ongoing reunification services, which could be provided by continued jurisdiction. Despite mother's struggles, the record makes clear that she loved A., wanted to support him, and wanted to reunify with him. Thus, the juvenile court did not abuse its discretion in finding that continued supervision was warranted. (See, e.g., *In re A.F.*, *supra*, 102 Cal.App.5th at pp. 785–786 [no abuse of discretion where juvenile court retained jurisdiction over children at risk of harm]; *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134 [denial of request to terminate jurisdiction under § 361.2 affirmed where "substantial evidence showed a need for continuing supervision" over the child].)

23

## DISPOSITION

The juvenile court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COGLIATI, J.*

We concur:

MORI, Acting P. J.   TAMZARIAN, J.

*Judge of the Santa Cruz Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24